Thank you judges, may it please the court, Sergio Garcia on behalf of Mr. Cisneros. Cisneros' prolonged immigration stop at the Sierra Blanca checkpoint violated his constitutional rights. By his own admission, Agent Villegas based reasonable suspicion on his past experience in other drugs arrests at the same checkpoint. When we brought this to the attention of the district court in our motion to suppress, the government in its brief responded that Cisneros was stopped because, quote, Cisneros was driving alone from out of town in a vehicle with California plates heading east through the checkpoint, which presented articulable facts that rose to the level of reasonable suspicion that criminal activity was afoot, close quote. We told the district court this evening. Is it accurate to say that the eventual video that was there showed that the initial stop was only 45 seconds? It is around that time. I think the encounter with Mr. Villegas, Agent Villegas, is about 51 seconds, Judge, something like that. All right, because you originally estimated two to three minutes, I think. Yeah, that's the testimony that Agent Villegas testified to. Agent Villegas testified that it lasted two or three minutes, but in reality it was 51 seconds. We told the district court that this could not be, that the fact that Cisneros was driving in a California car, California plates, rental car heading east, it could not be enough. Otherwise, anybody driving from California or from anywhere heading east with California plates, he would be a suspect before it even reaches the checkpoint. We brought this to the attention of the district court, and the district court replied as follows. Agreeing with us, quote, and of course, Villegas immediately notices that it is a rental vehicle. So yes, maybe, maybe there is a little bit of what you're calling profiling, but it goes past that C, so the motion is denied. We attach a sizable list of cases where Agent Villegas had worked at the same checkpoint, and they have three things in common. The driver driving alone, they are from out of state, and they contain generic claims of nervousness. Agent Villegas testified as to generic claims of nervousness, but he also testified as to the validity of the wrestling card. Now, the government responded- Why does this matter if the consent was voluntary, and the consent happened at 51 seconds, I guess, according to what you said earlier? What matters is because by the time he asked for the consent for the dog sniff, the questions about his immigration status had dissipated. But didn't he testify, he still had the card, because you use him, the agent still having the card to say the consent wasn't voluntary, and didn't he say he was still, he flipped it on the back, he was still looking at the card? He testified to that, but the video shows that actually he didn't do any of that. He testified to the fact that, first of all, he said that my client, Mr. Cisneros, arrived to the checkpoint, and that he had to help back because Cisneros has to actually pull it out of his sleeve. He also testified that he had to check the security features on the card, which he didn't do. And our whole point about not having the video is the fact that if he could be untruthful about those things, he certainly could be untruthful about generic claim of nervousness, which you cannot see in the video. Let me ask you about, you said you attached a list of cases where the same agent was complaining about, or I guess pulling people over for follow-up. They were drug arrests, yes. Yes. Were those people convicted of smuggling drugs? My understanding is that they were. We attached, I think it was six to eight cases. So this agent, he's gotten pretty good at his job. You're complaining about him. It seems like he's pretty intuitive. He acts on a hunch. He's got to interpret excessive nervousness. He acts on a hunch, but he has to still develop the reasonable suspicion as to the specific case in each fact. Otherwise, you know, as I said, just the fact that you're driving from out-of-state place from California heading east on I-10, which has a lot of traffic, that's not enough. The video also shows that Agent Cisneros held Agent Villegas, I'm sorry, Agent Villegas held Cisneros' car. From the minute my client approached the booth, he has his car in his hand, gives it to Agent Villegas, and he never got it back. So this Court ---- When in the 51 seconds did the stop become unreasonable? Because, well, our point is that he did not develop reasonable suspicion to prolong the immigration stop. When did the immigration stop end within that 51 seconds? I think he has the car, and if you see in the video, the interaction lasts 12 seconds. Anything after 12 seconds, we contend that there was no question, there was no reason to prolong the stop. This Court has held that immigration stops are legal, but checkpoints are not legal. And this Court has held that when an immigration agent holds a resident car, that the ability of the alien to decline a request is significantly impaired. With respect to the video, judges, I worked the case below, and the incident happened on February 3rd, 2017. Right after the incident, I requested the video. On March 14th, about a month later, I received in discovery a report of information, investigation, and in that report, it clearly expressly states that no video could be recovered prior to February 9th. Accordingly, I assumed that there was no video coming up, and the district court assumed the same thing because he held the suppression hearing without waiting for the video. We didn't know. The government states that it took five months of technical difficulties. That is simply unbelievable. All I wanted was the video at the biggest checkpoint probably in the country with multiple cameras, and it took five months to respond. I think that is unbelievable. We did not— You got it before trial. I'm sorry? You got the video before trial. Yeah, but at that time, our motion to suppress and a motion to reconsider, because we filed a motion to reconsider, had been denied. The court issued an order, and in that order, it stated that the court watched the video, but it did not address any of the discrepancies that we raised, and it doesn't have any factual findings. If you look at that order, it's three and a half pages, half page of legal analysis, and it also applies the wrong law because it says, clearly states, that at the Sierra Blanca checkpoint, the search was reasonable because the agent established reasonable suspicion. This Court has held that you don't apply the border doctrine to the Sierra Blanca checkpoint. At the Sierra Blanca checkpoint, searches are permissible only with probable cause. Long before my client was convicted, we presented this issue to the district court. The district—the video shows one thing that I think is very important that goes to the agents, and that is, all the time we were told that the agents enter my client's car after a dog alerted, after a dog arrived. When we watched—when I watched the video, I was shocked to see that an agent enters my client's car before the dog is even at the scene. Now, the government— Wasn't he just picking up a cup or something? Well, Judge— That is what the government states. The government states that he— Wasn't that what the video showed? No. The video doesn't show exactly what my client—what the agent grabs. The video doesn't show that. He didn't physically get in the car. He reached in. No. He gets in the car and he grabs something, but the video doesn't show exactly what he grabs. You can't see that. Not only that, there is no testimony regarding this drinking cup. Those are the attorney's words in her brief. Judges? Even if that was unlawful, why does it matter? Because they were still going to do the dog sniff anyway. If the dog alerts, they have probable cause, and I don't see how that— It goes to the truthfulness of the testimony. I mean, obviously what we're arguing is that the stuff was prolonged unlawfully. And so anything beyond that, it really—what this matters for is the credibility. I didn't have this video. I had no idea. I couldn't test it. I couldn't question anybody. Regarding this, because I assume that the government was truthful when they gave us the reports and the testimony. In my opinion, and I've been there with the federal defenders for about six years, working all kinds of cases, in this case, the government simply used underhanded tactics. At one point— in one important respect, which was the time, the length of the stop. As you said, the testimony was two to three minutes. It turns out it was less than a minute. So that's sort of inconsistent with your theory that this was some ploy to keep the evidence hidden on perhaps the most important issue. It puts the government in a better light. The length of the stop is not the issue for us. For us, it's the fact that the agents did not—Agent Villegas did not develop reasonable suspicion. What I was going to mention, Judge, is that at the suppression hearing, I subpoenaed the only agent who wrote the only report. And the only agent who actually wrote an affidavit sworn under oath before a magistrate judge. And the government moved to quash that subpoena, arguing, among other things, that that agent did not have any personal knowledge. When the affidavit in itself says clearly, I attest, based on personal knowledge, they tried a lot of tactics to secure the conviction of Mr. Cisneros. They were underhanded tactics. And they did this while they were turning a blind eye to justice. So for those reasons, I respectfully request that you vacate Mr. Cisneros's case and reverse the district court decisions. Roberts. Thank you, Mr. Garcia. You've saved time for rebuttal. All right. For the United States, I'm going to let you pronounce your name, because I'll mess it up. Thank you, Your Honor. May it please the Court, Elizabeth Berenger on behalf of the United States. Berenger. Okay. The search of the defendant's car in this case was lawful. The legality of any stop at an immigration checkpoint rests on simply the duration of the stop, so long as it's a permissible purpose in the immigration checkpoint. In this case, we have a very routine and brief stop, as the Court has seen from the video. The time from when Agent Villegas first started approaching the car until the defendant gave consent was less than a minute. During that time, Agent Villegas asked routine travel questions, questions about the defendant's citizenship, and requested and received consent to perform the dog sniff. The stop was clearly within the permissible limits and duration under this Court's precedent in Machuca-Berrera. Tell us about your opposition to the subpoena. Your Honor, well, the reason that they opposed it is because the report writer had no personal knowledge, so it was just under two e-regulations that the government requested that. Agent Bergenau's testimony was sort of irrelevant to the determination of reasonable suspicion or consent. He wasn't— Well, irrelevant and personal knowledge are two different things. Did the affidavit purport to say that he had personal knowledge? No, he didn't have any personal knowledge of the events. He wasn't even at the port on the date of the arrest. He simply was the case agent, and he based his information that he came up with based on the reports and speaking with the agents at a later time. That was clear from the affidavit? From the affidavit. I would have to review the affidavit, but it's very clear at the — in his testimony that he said that. Mr. Garcia said the affidavit said he was attesting based on personal knowledge. Is that not correct? I don't believe that's accurate. I would have to say — let me pull up the affidavit right here, the report of the investigation. I don't believe that's accurate. But even if it's true, I mean, what — I mean, even if that were true, he did testify at the suppression hearing. He was able to provide the evidence that he had no personal knowledge of the events that happened, and it's not really relevant to the reasonable suspicion to try to — So it wasn't suppressed? Excuse me? The subpoena was not suppressed? No. No. He was able to testify at the suppression hearing. He did testify at the suppression hearing and testified that he had no personal knowledge of the events that occurred. Once the consent to perform the dog sniff permissibly extended the stop for that purpose, of course, the dog alerted less than two minutes after the defendant — less than three minutes after he first arrived at the checkpoint, which gave probable cause to search the vehicle. As far as the consent issue that was raised by the defendant, other than holding his LPR card in his hand, there are no factors under the totality of circumstances to show this was an involuntary consent. This was a brief, lawful stop along a major interstate with all other motorists. The defendant was cooperative. He was inside his own car. Agent Villegas did not mention his suspicions. There's no evidence that he was abusive or threatened him in any way. And also, when he was holding the card, the stop was not yet complete. He was still — he hadn't asked or received consent, which, as we know from Michiko Barrera, is part of the immigration stop. So while he was going under — so under Perales and Brown, which is a case cited in Perales, it's not coercive when an agent retains those documents that he's rightfully entitled to have when he has not even completed the purpose of his stop. So — What about going back to the length or the — whether the stop up until the consent point was reasonable? Opposing counsel says the video shows that he wasn't really — while he was holding the card, he wasn't really examining the immigration card. I mean, he was looking in the back seat for — to see what was in the car and things like that unrelated, in his view, to an immigration stop. Well, I invite the court to look at the videos. That's not my read on it, taking the light — all the evidence in the light most favorable to the government in this case. We have an experienced agent of eight years who's holding a card who has it for a minute. He says he's basically checking the hologram and flipping it over. I think that that could easily happen and be missed on the video. But I really invite the court to view the videos in their entirety, and I believe that that — the evidence will support that. I also wanted to address the 12-second. He said that the search became unreasonable after 12 seconds, and that's clearly contrary to case law. In Machuca-Berrera, it says the time reasonably necessary to determine the checkpoint stop includes the time reasonably necessary to determine the citizenship status of the person who stopped. This would include the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention. So that was all happening within the less than one minute that Agent Villegas is spending with the defendant. Other cases that say inquiring about travel plans are consistent with an immigration — Absolutely. Yes, there are cases saying — even beyond the questions Villegas asked. You could ask about firearms. You can ask about drugs. It's all about the duration of the stop and whether there's a permissible programmatic purpose of that checkpoint. And here we have the amount of time is consistent with the case law in Jaime in Machuca-Berrera, times of less than one minute to ascertain his travel plans and his request and receive permission to perform that dog sniff. Again, a very routine — I mean, if you look at that primary inspection and you see these agents, they are moving car after car, hundreds and hundreds of cars. And something about that car — I mean, in all these lines of cars that this agent sees, you see he's very routine in the way that he does this. And just something about it made him ask consent in less than a minute. And that is permitted under Supreme Court and Fifth Circuit precedent. Now, I would like to move on to the alternative finding by the district court. I do believe that the consent, which was the government's primary theory all along, clearly supports this consent-based dog sniff and move to secondary. But the court was also properly found. The initial stop created reasonable suspicion for the dog sniff. And I would first like to address, because these sizable cases that the defense attached to his motion to suppress — and I looked at these cases. There are six of them. In the record, they're pages 102 to 124. And again, as Judge Clement noted, they were all cases where drugs were found. But if you look at the cases, Agent Villegas is only the primary inspecting agent in one of those cases. In all other cases, he's related. He might be running the dog or he might be in the secondary, but he's not one making the determination of reasonable suspicion. So Tejas is the only case where he was on primary. All the other five, they're not. And in the one case that he was involved in, there was no nervousness. There was no rental car. There was Texas plates. So all those certain factors, I know this whole discussion of profiles is maybe tinged with something else, but profiles is simply what he's talking about are patterns or factors that weigh into the totality of circumstances. And, yes, as the Supreme Court has recognized, nervousness can be suggestive of criminal activity. It's not indicative. It's not alone. These generic claims of nervousness is not enough, but it's certainly something that the court can consider. And we can see these in these cases attached to the motion to suppress. So the reason that Villegas sent the car in Tejas, which is 106 to 108, is because a dog alerted in primary. And you can see that dogs alerting is the profile of what happens where people are usually sent to secondary. So just to address that, I encourage the court to look at it. But also we do have reasonable factors here, and it's not based on a profile. It's based on clearly articulated factors, such as excessive nervousness. And this is not conclusional nervousness. This is not nervousness in isolation. This defendant was shaking excessively. His left eye was twitching. His hands were shaking as he hands over his card. Illinois v. Ward Law recognizes that nervousness is a factor under the totality of circumstances that the court could have considered. The defendant seemed unsure of his travel plans. He fumbled for words to answer the agent's questions. He said he was attending a wedding in Dallas, but nothing in the car confirmed his story. He was driving a rental car, which the court found was a significant factor. And together, all of these factors warranted a brief extension of the stop to sort of clear up those ambiguities with a dog sniff. So I just have one moment. Oh, I would just like to also clarify that the court, in considering the motion to reconsider, did view the video. So at the time the court made its determination and reconsidered, it did have the benefit of the video. I'm not sure if that was clear from the argument. So if the court doesn't have any further questions, I would ask the court to affirm the sentence in judgment. Thank you. Thank you, Ms. Berenger. Mr. Garcia, you've saved time for rebuttal. Just briefly, judges. In making that decision in this case, I strongly advise, request, that you look at the law when it comes to the Sierra Blanca checkpoint. The law is clear. To prolong an immigration stop, you must develop reasonable suspicion. And to have consent, to give consent, that consent is impaired when the agent holds a resident card. Also, I would invite you to read the affidavit that Agent Original tested in front of a magistrate judge. I would like you to read the transcript. He testified that he had personal knowledge. And I would also invite you to look at the video and check it against the testimony of Agent Villegas. He states that my client had to pull his car from asleep, that he had to held back. That doesn't happen. That he checked all the security features. That doesn't happen. And if you can question the truthfulness of that testimony, you certainly can test the truthfulness as to the nervousness. We never had an opportunity to test the truthfulness of that testimony, to impeach him. The district court said that they review the video. However, when the judge applied the wrong law, and when in that decision there is no factual findings, the decision is questionable. I honestly believe that in this case the AUSAs did anything they could, but they forgot about one aspect that is important. We have to follow the law. We have to follow the Fourth, the Fifth, and Sixth Amendment. For those reasons, I respectfully request to duplicate the sentence and to reverse the district court. Thank you, judges. Thank you, Mr. Garcia. Your case is under submission.